**MEDOW INDUSTRIES, INC., and Robert S. Medow, Plaintiffs,**

v.

**KIRSCH COMPANY. INC., Defendant.**

No. 71 Civ. 4351.

United States District Court,
S. D. New York.

Feb. 26, 1973.

Philip Handelman, New York City, for plaintiffs.

Townley, Updike, Carter & Rodgers, New York City, and Kirkland & Ellis, Chicago, Ill., for defendant.

## OPINION

TYLER, District Judge.

Plaintiffs in this action are Medow Industries, Inc. ("MI"), a Florida corporation headquartered in Miami, and its president and sole stockholder, Robert S. Medow ("Medow"), a resident of Hialeah

Gardens, Florida. Defendant Kirsch Company, Inc. ("Kirsch") is a Michigan corporation with its central offices in the city of Sturgis, Michigan.

MI manufactures arches and columns, holding several patents on its composite structures,[1] and, prior to May 27, 1969, marketed its wares through regional distributors operating under licensing agreements. On that date it entered into an agreement with Kirsch, a maker and distributor of drapery hardware, whereby Kirsch was given an exclusive worldwide license to sell MI's structures. The essence of the agreement was a commitment by Kirsch to purchase $600,000 worth of MI's output over a 14 month period.[2] Medow, perforce cancelled and, in effect, bought back its outstanding licensing arrangements;[3] Medow also agreed to maintain a minimum level of production.[4]

The agreement was to run for successive 5 year periods, subject to termination by either signatory on written notice at least one year prior to the end of a period.[5] The basic obligations of the parties were to continue as initially set down, with Kirsch's long range purchase commitments fixed at $40,000 a month or $200,000 a quarter.[6]

By August, 1970, Kirsch had in fact purchased $600,000 worth of MI's arches and columns, and, through its network of regional salesmen, was attempting to sell them under the name of "Arch Elegance" and "Arch Eminence". Stocks were sent to warehouses in Scottsville, Kentucky; Beacon Falls, Connecticut; Miami, Florida; Chicago, Illinois; Dallas, Texas; and Oakland, California where invoices were prepared and orders filled;[7] and, according to Richard U. Scott, Vice President in charge of marketing at Kirsch, $180,264.00 was spent on promotions in fiscal 1970 alone.[8]

The merchandise, however, did not sell. Only $179,467.00 worth was marketed by June 30, 1970,[9] leaving Kirsch with an inventory value of arch and column structures and accessories of $392,438.-00.[10] As a result, its warehouses were filling up, and, aside from the obvious direct financial loss it suffered from this poor venture, Kirsch found storage space for its profitable drapery hardware line becoming scarce.[11]

A decision was made to discontinue the monthly accretions to this stock, and, on July 22, 1970, Scott wrote Medow in Hialeah Gardens informing him that Kirsch would no longer meet its purchase quotas.[12] Medow responded on August 26, by letter addressed to Scott in Sturgis, Michigan, citing him to paragraph 14(b) of the agreement, which entitled MI to terminate under these circumstances,[13] and informing him that MI in-

---

1. U.S. patents nos. 3,421,269 and 3,511,006. Canadian patents nos. 834409 and 864217.

2. Agreement of May 27, 1969, hereinafter "agreement", paragraph 14(a).

3. See Exhibits M, N, O and P to Plaintiffs' Answers to Interrogatories.

4. Agreement, para. 3.

5. Agreement, para. 14(a).

6. Agreement, para. 14(b).

7. Customer remittance was directed to Sturgis, Michigan.

8. Affidavit of Richard U. Scott, hereinafter "Scott Affidavit", para. 6.

9. Scott Affidavit, Exhibit 2.

10. Scott Affidavit, para. 6.

11. Scott Affidavit, para. 7.

12. Scott Affidavit, Exhibit 4.

13. Agreement, para. 14(b):
"Medow may terminate this Agreement upon written notice to Kirsch within thirty (30) days after the end of any three month period during which Kirsch has failed to order at least $200,000 of the Product or any month during which Kirsch has failed to order at least $40,000 of the Product, calculated at the prices to Kirsch stated in paragraph 1(a) of Exhibit A. For purposes of this paragraph, the term 'any quarter' means such successive three month period beginning one year after the end of the Start-Up Period and the term 'any month' means such successive 1 month period beginning one year after the end of the Start-Up Period."

tended to exercise its option.[14] Kirsch did not object, and the agreement was effectively terminated.

Free as it was of its purchase commitments, Kirsch still found itself laden with arches and columns. As early as August 1, 1970 prices had been cut,[15] but by September an inventory value of $380,000 remained.[16] Prices were reduced again, effective September 1, with discounts of 70% off list price proffered to the trade.[17]

Sales were finally effected at these prices, as soon as late September,[18] but until August, 1971, when Kirsch arranged to dispose of all its outstanding stocks to Harry Rich, Inc., a Florida retailer, $158,468.26 worth was still on hand.[19] The business venture, from start to finish, cost Kirsch $320,930, exclusive of the expenses of litigation.[20]

The September price cut referred to above evoked strong reaction from MI. It had only been able to allow Kirsch when purchasing under the agreement 68% off list;[21] not surprisingly, therefore, its management found that competing with the 70% discounts offered by Kirsch was resulting in an overall loss.[22]

Kirsch's response was an apology for any damage MI was suffering as a result of the price cuts, and an offer to sell back to MI what inventory remained at 50% of the original purchase price.[23] This was rejected by Medow, as it "would have denied plaintiffs the benefits which had accrued from the agreement." [24]

Again, in February, 1971, Kirsch offered to sell back its stocks to MI, this time at 20% of the agreement price.[25] Negotiations apparently took place, and drafts of an "Agreement and Mutual Release" were prepared.[26] But Medow rejected even this overture, primarily because by the terms of the agreement he was to act as personal guarantor of MI's payment of the repurchase price.[27]

Dealings between the parties apparently ended with this refusal, and soon after, on October 6, 1971, MI instituted these proceedings. All but one of the claims for relief in the complaint are based on Kirsch's sales below its cost, made from September, 1970 to August, 1971. Breach of contract is alleged,[28] grounded on what MI asserts, in direct contradiction as I see it of paragraph 14(f) of the agreement,[29] to be a post-termination obligation of Kirsch to not

14. Affidavit of Robert S. Medow, hereinafter "Medow Affidavit", Exhibit D.

15. Scott Affidavit, Exhibit 5.

16. Scott Affidavit, Exhibit 3.

17. Scott Affidavit, para. 9. See also Medow Affidavit, Exhibit F.

18. Scott Affidavit, para. 9.

19. Scott Affidavit, para. 9.

20. Scott Affidavit, para. 12.

21. Exhibit A to the Agreement, para. 1(c) and (d) indicate a sliding discount, ranging from 66% to 71% depending on the quantity purchased by Kirsch in the course of a year. 68%, however, as set out in the last paragraph of 1(d) to Exhibit A was contemplated as the norm.

22. Medow Affidavit, Exhibit D. Telegram from Medow in Hialeah Gardens, Florida to Scott in Sturgis, Michigan sent Nov. 29, 1970.

23. Scott Affidavit, Exhibit 6, Letter from Scott in Sturgis, Michigan to Medow in Hialeah Gardens, Florida dated Dec. 22,

1970. Assuming Kirsch purchased at 68% off list price, this was an offer to resell at 84% off list.

24. Medow Affidavit, para. 10.

25. This would be equivalent to 93.6% off list price.

26. Scott Affidavit, Exhibits 7 and 8.

27. Medow Affidavit, para. 11. Scott Affidavit, Exhibit 8, para. 12.

28. Complaint, para. 18.

29. Agreement, para. 14(f):
"After the termination of this Agreement, Medow (except to the extent set forth in paragraph 14(e) of this Agreement) and Kirsch shall be free to engage in any activities in which it could have engaged if this Agreement had never existed and shall not be prejudiced in any way by the existence of this Agreement, that is, Kirsch shall be free to manufacture, have manufactured, use and sell Product except as it may be precluded therefrom by such valid patent and Trademark Rights, if any, that Medow may thereafter retain."

resell to the public at less than 68% off list. Breach of fiduciary duty[30] and malice[31] are asserted, based on the damage MI claims to have suffered in its efforts to compete with the 70% discounts Kirsch offered. Paragraph 13 sets forth Kirsch's "dumping" the arches and columns on the market without announcing a close-out sale as a cause of action, and paragraph 16 asserts violations of the sales-below-cost provisions of 22 states as a basis for recovery. The one independently grounded claim is that charging Kirsch with fraud in the inducement.[32] Federal jurisdiction is based on diversity, and damages of $3,000,000 are sought. Kirsch joined issue on December 22, 1971, and, aside from controverting MI's allegations, set forth several counterclaims. MI is charged therein with having breached the agreement by delivering faulty merchandise, misrepresentation of the salability of its arch and column structures, and willful delay and eventual refusal to deliver components necessary to Kirsch's efforts to dispose of its inventory after the agreement was terminated.[33]

Kirsch has moved this court to (1) dismiss the complaint pursuant to F.R. Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted; (2) for summary judgment pursuant to F.R.Civ.P. 56(a); and (3) to dismiss the action on the ground of *forum non conveniens*. There is merit in the third argument put forth by Kirsch, and, for the reasons set out below, this action should be dismissed as having been brought in an inconvenient forum.

## FORUM NON CONVENIENS

■ Authorized to do business in New York as a foreign corporation pursuant to N.Y. Business Corporation Law § 1301, Kirsch is subject to the jurisdiction of the courts of New York. Diversity of citizenship is clearly present, and the amount in controversy exceeds $10,000; hence a federal district court sitting in New York has jurisdiction to entertain this suit.

■ But, as this action is before this court solely on the basis of diversity jurisdiction, it should not be heard if, had it been brought in a state forum, that court (1) would have the discretion to not exercise its jurisdiction and (2) would in fact have chosen not to exercise its jurisdiction. Weiss v. Routh, 149 F. 2d 193 (2d Cir. 1945). To proceed otherwise, as Judge Learned Hand, speaking for the court in *Weiss* pointed out, would violate the dictates of Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and permit parties of diverse citizenship a choice between fora offering divergent outcomes (at 195 of 149 F.2d).

■ The New York courts are under no compulsion to add to their already heavy burdens by hearing a case with no substantial nexus to this state. Silver v. Great American Ins. Co., 29 N.Y.2d 356, 328 N.Y.S.2d 398, 278 N.E.2d 619 (1972), and, do not hear cases where the nexus is negligible, Mayflower Restaurant Enterprises, Inc. v. Gulf American Corp. of Arizona, 36 A.D.2d 941, 321 N.Y.S.2d 490 (1st Dept. 1971).

In *Mayflower, supra*, the court was presented with a dispute over a contract made in Louisiana between a Louisiana corporation and an Arizona concern. Although jurisdiction *in personam* of defendant existed, the trial court's dismissal on *forum non conveniens* grounds was summarily affirmed. See also English v. New York, N. H. & H. R. Co., 161 App. Div. 831, 146 N.Y.S. 963 (1914); Pharo v. Redmont Aviation, Inc., 34 A.D.2d 752, 310 N.Y.S.2d 120 (1st Dept. 1970).

The nexus to New York of the subject matter of this case is virtually non-existent. The parties are foreign corporations and residents of other states. The sales below cost that underlie almost all the plaintiffs' claims for relief were made from Kirsch's warehouses and

---

30. Complaint, para. 12.

31. Complaint, para. 14.

32. Complaint, para. 15.

33. Answer, pp. 15–17.

finalized in Kirsch's central offices, none of which are located in New York, and all post-termination negotiations and conmunications were carried on between Sturgis and Hialeah Gardens. Reference to where the agreement was negotiated and signed, events relevant to plaintiffs' assertions of fraud in the inducement, is notably absent from the papers of either party. But, had New York State been the situs, surely plaintiffs, put on notice of defendant's motion to dismiss on *forum non conveniens* grounds, would have pointed it out.

■ It is only where special circumstances can be shown to exist that the New York courts are bound to open their doors to out-of-state litigants with claims based upon out-of-state events. The most recent example of this is Varkonyi v. S.A. Empress a De Viacao Airea Rio Grandense (Varig), 22 N.Y.2d 333, 292 N.Y.S.2d 670, 239 N.E.2d 542 (1968), an action in tort, where a determination by the Appellate Division to dismiss on *forum non conveniens* grounds was reversed. The tort there complained of occurred out of state; the parties were not New Yorkers, but the Court of Appeals found that New York offered the only forum wherein all defendants could be joined and that a related action was pending in a federal court sitting in New York to which *Varkonyi* could be consolidated for discovery purposes. This was held sufficient to mandate the retention of jurisdiction.

■ Such circumstances are absent here. Plaintiffs would have no difficulty subjecting defendant to the jurisdiction of the courts in Florida or Michigan, or, for that matter, in any state where defendant carried on its warehousing and wholesaling of the Arch Eminence and Arch Elegance lines.[34] Witnesses would be more accessible, and discovery, repeatedly asked for by plaintiffs, might impose less of a burden on defendant.

34. Any of these states would have an interest greater than that of New York in this suit; that of exercising some control

This action is therefore dismissed without prejudice as having been brought in an inconvenient forum.

It is so ordered.

over the conduct of foreign corporations carried on within their borders.